George LUCAS, Alice Lucas, and G&T Lucas Tractor & Equipment Company, Plaintiffs-Appellants,†

v.

ROBYN GODFREY, Defendant-Respondent,

READER'S DIGEST ASSOCIATION, INC., and Reuben H. Donnelley, Defendants,

READER'S DIGEST ASSOCIATION, INC., Third Party Plaintiff,

v.

Rebecca SKALLERUD, Third Party Defendant.

Court of Appeals

*No. 90-0472. Submitted on briefs November 5, 1990.—Decided February 21, 1991.*

(Also reported in 467 N.W.2d 180.)

†Petition to review denied.

51

For the plaintiffs-appellants the cause was submitted on the briefs of *Jon P. Axelrod* and *William D. Mollway* of *DeWitt, Porter, Huggett, Schumacher & Morgan, S.C.*, of Madison.

For the defendant-respondent the cause was submitted on the briefs of *James E. Doyle, Jr., Marsha M.*

*Mansfield* of *Lawton & Cates, S.C.,* of Madison, and *James M. Bablitch, Esq.,* of Stevens Point.

Before Eich, C.J., Dykman and LaRocque, JJ.

EICH, C.J. George and Alice Lucas (hereafter "Lucas") appeal from a summary judgment and an order dismissing their action to recover the $150,000 prize in a *Reader's Digest* sweepstakes contest and awarding the prize to the respondent, Robyn Warren.[1] When a dispute arose as to ownership of the winning entry card, the magazine paid the contest proceeds into court and the principal parties, Lucas and Warren, litigated entitlement to the prize.

We conclude that under general principles of contract law applicable to contests such as this, Warren is entitled to the prize amount and we therefore affirm the judgment and order. In doing so, we reject Lucas's alternative theories of recovery based on fiduciary duty, negligence, conversion and constructive trust. Finally, we hold that Warren is entitled to enhanced costs and interest under sec. 807.01, Stats., because, after Lucas rejected her pretrial settlement offer, Warren recovered a more favorable judgment.

The basic facts are not in dispute. Warren had been Lucas's secretary for several years. She performed various office duties, including picking up the mail. From time to time, Warren received personal mail at the office address—a post office box[2]—and this controversy centers around a contest entry form sent to that address.

---

[1] Now Robyn Godfrey.

[2] Lucas maintains that Warren lacked permission to receive mail at the business address, and Warren asserts that she had been given permission to do so. Resolution of this dispute, however, is not necessary to our consideration of the legal issues, for it is undisputed that Warren received mail at the office address.

54

The *Reader's Digest* sweepstakes is a promotional effort on the part of the magazine designed, among other things, to increase subscription sales. Contest "eligibility cards" are sent to people around the country and entry is accomplished by returning the card to the magazine. The magazine obtains lists of subscribers to various other publications and mails promotional materials and contest eligibility cards to persons whose names appear on the lists. The cards contain number codes, indicating the particular magazine subscriber list from which the recipient's name and address were taken.

*Reader's Digest* sent an eligibility card, addressed by computer, to "Robyn W. Lucas" at the office post office box address. Warren crossed out the initial and the name "Lucas," inserted "Warren" in its place and returned the card. The card was eventually selected as the winner of a $150,000 prize.

The code number on the card indicated that the name and mailing address had been taken from a list of subscribers to *Ellery Queen's Mystery Magazine.* Warren was an *Ellery Queen* subscriber and the Lucases were not. The magazine's circulation director testified that, for a period of time, Warren's subscription was listed in the name Robyn W. Lucas, but that this error was corrected and at some point she began receiving the magazine as Robyn Warren.[3]

---

[3]*Ellery Queen's Mystery Magazine*'s subscriber files use "match codes," rather than actual names, to trace account histories. According to the magazine's circulation director, the match code is a three-letter combination of the first, third and fourth letters of the subscriber's last name. The code for Warren's initial *Ellery Queen* subscription was "LCA," the first, third and fourth letters of the name "Lucas." The magazine's files also indicated that the first initial of the original subscriber's name was "R," that the subscription address was the Lucas business address, and

When Warren's receipt of the prize became known, Lucas sued Warren and *Reader's Digest,* claiming that he was entitled to the money. Warren answered and cross-claimed, seeking a judgment that the money was hers. In light of these competing claims, *Reader's Digest* deposited $150,000 with the court, asking it to decide whether Lucas or Warren, or either of them, were entitled to claim the prize. Lucas and Warren both moved for summary judgment and the trial court granted Warren's motion.

The trial court, applying basic principles of contract law, concluded that: (1) *Reader's Digest* intended to offer the contest entry to Warren, as the *Ellery Queen* subscriber at the address to which the card was sent; (2) that Warren accepted the offer by returning the card; and (3) as a result, Warren was entitled to claim the prize. Other facts will be discussed in the body of the opinion.

In summary judgment cases, we employ the same analysis as the trial court. *In re Cherokee Park Plat,* 113 Wis. 2d 112, 115–16, 334 N.W.2d 580, 582 (Ct. App. 1983). Where the material facts of a case are not disputed, as is the case here, summary judgment is an appropriate means of raising and deciding the legal issues in the case. *Smith v. State Farm Fire & Cas. Co.,* 127 Wis. 2d 298, 300, 380 N.W.2d 372, 373 (Ct. App. 1985). We decide those issues *de novo,* without deference to the trial court's decision. *Green Spring Farms v.*

that at some point after the subscription was initiated, the subscriber name was corrected to "Robyn Warren." (As a possible explanation for the "Robyn W. Lucas" name, Warren stated that she occasionally used the address "Robyn Warren, c/o Lucas" in her correspondence.)

*Kersten,* 136 Wis. 2d 304, 315-17, 401 N.W.2d 816, 820-21 (1987).

Pursuing that methodology, we have examined the parties' pleadings and conclude that they raise and join the issue—that the claim for the prize stated in Lucas's complaint is countered by Warren's responsive pleadings. In addition, we see no material issue of fact. As indicated, both parties moved for summary judgment and neither argues that factual disputes bar the other's motion. "The practical effect is that the facts are stipulated and only issues of law are before us." *Silverton Enterprises v. General Cas. Co. of Wisconsin,* 143 Wis. 2d 661, 669, 422 N.W.2d 154, 157 (Ct. App. 1988).

Lucas argues first that he is entitled to the prize under "basic principles" of contract law. While Wisconsin courts have not had the opportunity to consider the question directly—presumably because of the state's historic anti-lottery laws—we agree with the rule, which has been adopted in nearly every other jurisdiction in which the question has arisen, that contract law governs the sponsor-contestant relationship.[4] *See* Annotation, *Private Contests and Lotteries: Entrants' Rights and*

---

[4]The only Wisconsin case we have found mentioning contract law in such a situation is *Matta v. Katsoulas,* 192 Wis. 212, 212 N.W. 261 (1927). There, the "contest" was an automobile raffle. Everyone attending the raffle received a ticket, and the plaintiff, who had to leave before the drawing, gave her ticket to a friend telling him to let her know if she won the car. The ticket won and the friend kept the car. The plaintiff sued to recover the car, and the defendant attempted to defeat recovery by claiming, among other things, that the drawing was an "illegal contract" in violation of the anti-lottery law. The court suggested, in *dicta,* that even if the raffle was a contract prohibited by law, that did

*Remedies,* 64 A.L.R.4th 1021, 1045–52 (1988). An entrant or contestant who performs the act requested—here returning the card—accepts the offer to enter the contest and thus "form[s] a valid and binding contract with the promoter." *Id.* at 1045. The nature of the contract in such a contest, of course, is that if the contestant's number is selected as the winner, he or she is entitled to the prize.

Lucas argues that because the card was addressed to "Robyn W. Lucas," and because Robyn Warren is not "Robyn W. Lucas," she cannot recover. Under that reasoning, of course, neither can Lucas.

The *Restatement of Contracts* tells us that, in contract law, "[t]he manifested intention of the offeror determines the person or persons in whom is created a power of acceptance." *Restatement (Second) of Contracts* sec. 29 (1981). According to *Reader's Digest's* general counsel, the magazine's intent when it sent the contest eligibility card to the Lucas post office box was to get the contest materials—and the magazine's promotional messages—"to prospective customers, in this particular case . . . active subscribers to *Ellery Queen Magazine.*"

These facts admit of a single reasonable inference: that *Reader's Digest* intended to offer entry in its sweepstakes to a person whose name appeared on the list of active subscribers to *Ellery Queen's Mystery Magazine,* and who would receive mail at the address taken from that magazine's subscriber list—Post Office Box 579, Wisconsin Rapids, Wisconsin. The fact that the card was addressed to Robyn W. Lucas, rather than Robyn

---

not affect the bailor-bailee relationship between the parties. *Id.* at 213–14, 212 N.W. at 261–62.

Warren, is explained by the undisputed evidence of the manner in which Warren's name was originally—and mistakenly—listed in the *Ellery Queen* subscriber files. "Obvious errors of expression" in a contract are correctable and not fatal to the agreement where the agreement itself and the surrounding circumstances convince the court of the "inadverten[ce]" of the error. 3 A. Corbin, *Contracts* § 552, pp. 207–209 (1960). The circumstances of this case, evidenced by undisputed facts, satisfy us that any error in listing Warren's name in the *Ellery Queen* files, and thus on the *Reader's Digest* sweepstakes computer-generated contest mailing label, was indeed inadvertent and does not detract from the validity of the *Digest's* sweepstakes offer. By accepting the offer made to her, Warren became eligible for the prize and when her number won, the trial court correctly awarded it to her.[5]

Lucas disagrees. He argues first that the effect of the trial court's decision was to violate his "property interest" in his name, by allowing Warren "to divert mail containing the Lucas surname without . . . permission." We are not persuaded. It may be, as Lucas contends, that he has a property interest in his name which is sufficient "to support [a] legal action[ ] for damages for [its] unauthorized use," but there is no evidence that Warren ever improperly "used" the name Lucas. The uncontradicted evidence is that the "Robyn W. Lucas"

[5]Lucas also argues that the trial court's ruling should be overturned because it ignored the contest regulations prohibiting transfer of entry cards except in limited situations. As we have held, however, under general principles of contract law Warren was the intended recipient of the entry form; it was not transferred. We note, too, that *Reader's Digest* representatives acknowledged that there were no contest rules covering this rather unusual fact situation.

name initially, and erroneously, shown on the *Ellery Queen* records was corrected. There is nothing in the record suggesting that Warren intentionally appropriated or "used" Lucas's name for any purpose.

Lucas also contends that if Warren is awarded the prize, he is nonetheless entitled to recover damages from her under one of several theories: (1) that she breached a "fiduciary duty" owed to him; (2) that she "converted" his property when she returned the entry card; and (3) that she negligently caused him to lose an "economic advantage." We reject all such claims.

Lucas's "fiduciary duty" argument is based on the common-law rule that an employee must return to his or her employer any profits obtained in connection with the employment or the employer's business. *See Degner v. Moncel,* 6 Wis. 2d 163, 167, 93 N.W.2d 857, 860 (1959). It is true that collecting and sorting the mail sent to the post office box was one of Warren's duties as Lucas's secretary. But that does not bring her within the purview of the authorities cited by Lucas, for there is no evidence that she received a "secret profit . . . in the course of performance" of her employer's business. 53 Am. Jur. 2d *Master and Servant* § 101 (1970). It is undisputed that Warren received personal mail at her work address; but this was a personal concern wholly unrelated to the performance of Lucas's business and Warren's duties as his secretary.

We reach a similar conclusion with respect to Lucas's "conversion" claim. Conversion, which Prosser describes as a "fascinating," if "highly technical . . . and complicat[ed]" tort,[6] is usually defined as the wrongful

---

[6]W. Prosser, *Law of Torts,* 79 (4th ed. 1971). *See also,* Prosser, *The Nature of Conversion,* 42 Cornell L.Q. 168 (1957).

exercise of dominion over property. In its most common form, it is the "unauthorized transfer of the goods to one who is not entitled to them." *Production Credit Ass'n v. Equity Coop Livestock Sales Ass'n,* 82 Wis. 2d 5, 10, 261 N.W.2d 127, 129 (1978).

Lucas suggests that U.S. Postal Service regulations provide him with an ownership interest in the mail—including the "Robyn W. Lucas" contest entry materials—sent to his business post office box, and that Warren thus converted his property to her own use without his consent. We disagree. Neither the postal regulations, which indicate only that post office box lessors are entitled to receive mail addressed to the box,[7] nor whatever property right he may have in his surname, grant him an ownership interest in the piece of mail at issue in this case.

As for Lucas's claim for "loss of economic advantage," it is grounded on negligence and is based on a 1917 Texas Court of Appeals case ruling that the second-prize winner in a hog-judging contest—who was apparently unable to successfully compete for the first prize because a railroad shipment of hogs was delayed—could sue the railroad for the amount of the first prize.[8] Lucas has not shown how Warren was negligent; and beyond that, we consider the Texas hog-judging case unpersuasive on the point argued.[9]

---

[7]U.S. Postal Service *Domestic Mail Manual,* §§ 951.122, 951.151 (June 18, 1989).

[8]*Kansas City, Missouri and Ohio Railway Co. v. Bell,* 197 S.W. 322 (Tex. Civ. App. 1917).

[9]Lucas also asks that we impose a constructive trust in his favor on Warren's sweepstakes winnings. A constructive trust is "an equitable device [designed] to prevent unjust enrichment, which arises when one party receives a benefit, the retention of which is unjust to another." *Wilharms v. Wilharms,* 93 Wis. 2d

Finally, Lucas challenges the trial court's award of costs to Warren. The judgment allowed her double costs and enhanced interest pursuant to secs. 807.01(3), (4) and (5), Stats. Under those sections, if, prior to trial, one party serves upon the other a written offer of settlement, and if the offer is not accepted and the offering party "recovers a more favorable judgment" than that offered, he or she is entitled to double costs and enhanced interest.

Lucas commenced this action against *Reader's Digest* and Warren.[10] His complaint sought judgment against the magazine for $150,000, as well as a declaration that Warren was not entitled to the prize. In the alternative, Lucas asked that the court divide the prize between himself and Warren. Warren's answer and cross-claim sought judgment dismissing Lucas's action and awarding her the prize.

Several weeks after the issues were joined, Lucas sent Warren a document entitled "Offer of Settlement of Plaintiff George Lucas to Defendant Robyn W[arren]." The offer proposed that the $150,000 *Reader's Digest*

671, 678, 287 N.W.2d 779, 783 (1980). To come within the rule, the benefit must have been obtained "by means of . . . fraud, duress, abuse of a confidential relationship, mistake, commission of a wrong, or by [some] form of unconscionable conduct." *Id.* at 679, 287 N.W.2d at 783. None of these factors have been shown to exist in this case, however. Thus, on its face, the principle is inapplicable.

[10]The company retained by *Reader's Digest* to "judge" the contest was also named as a defendant in the action, as was another of Lucas's employees who briefly claimed an interest in the prize. Lucas never pursued any claim against either of them. And, after *Reader's Digest* deposited the money with the court it, too, was dismissed from the action.

had deposited with the court be evenly split between the two of them. Warren responded with her own settlement offer proposing that the money be divided $140,000 to her and $10,000 to Lucas.

Lucas, arguing that the award of costs was error, refers us first to language in sec. 807.01(1) Stats., describing the settlement offer as one "to allow judgment to be taken against the defendant for the sum . . . therein specified . . .." Even though he had earlier sent his own offer to Warren under the same statute, he argues that Warren's offer to him was "not capable of acceptance." This is so, he maintains, because, at the time the offer was made, he was seeking judgment against *Reader's Digest,* not against Warren,[11] and the statute does not "allow one defendant to unilaterally offer a judgment against a co-defendant." Thus, Lucas argues, he was justified in declining to respond to the offer and should not be penalized for doing so. The trial court's award, however, was made under secs. 807.01(3), (4) and (5), not under subsection (1), where the language Lucas urges upon us is found. Even so, for reasons discussed at note 12, we agree with Warren that had Lucas chosen to accept the offer, the entry of judgment implementing its terms by paying out the funds deposited with the court by *Reader's Digest* would have been *pro forma.*

Lucas also argues that Warren's settlement offer was made to "multiple parties" and was thus invalid, citing *DeMars v. LaPour,* 123 Wis. 2d 366, 366 N.W.2d

---

[11]Lucas's original complaint stated that "no money judgment [was being] sought against Robyn [Warren]." A few months later, however, he filed an amended complaint adding the "conversion," "fiduciary duty," and other causes of action and asking the court, should it award any portion of the contest proceeds to Warren, to enter judgment against her in an equal amount.

891 (1985), where the court held that the plaintiffs' joint offer to several defendants did not qualify under sec. 807.01, Stats. Because Warren transmitted copies of her offer to attorneys for the other parties who were originally named in Lucas's pleadings in the case, Lucas contends that it was a prohibited "joint offer." We disagree. The face of Warren's offer indicates in plain language that it was being made to Lucas who, at the time, was the only other principal claimant to the escrowed prize money.[12]

[12]Lucas's argument that other claimants were in the case at the time of Warren's offer and that their presence as defendants made it not only an impermissible "multiple offer," but also one incapable of being accepted by him, needs to be considered in its factual context.

As indicated, Lucas originally sued *Reader's Digest* and Warren. On June 29, 1988, when the magazine filed its answer and interpleader asking the court to determine the contest winner, it also deposited $150,000 with the court and sought to withdraw from the action. The magazine's pleadings also joined another of Lucas's employees, Rebecca Skallerud, as a third-party defendant on grounds that Skallerud had informed *Reader's Digest* that she was "Robyn W. Lucas," that Skallerud was her married name, and that she was entitled to the prize. On July 25, 1988, Skallerud served and filed an answer to the magazine's third-party complaint "withdraw[ing] any claim she has or may have had" to the $150,000.

Thus, when Warren served and filed her offer of settlement on July 26, 1988, one of the two "other parties" to the action, *Reader's Digest,* had paid the prize into court and asked the court to determine the validity of Lucas's, Warren's and Skallerud's claims; and the only other possible claimant, Skallerud, had withdrawn any claim to the funds. Thus, on the date of Warren's offer, she and Lucas were the only ones actually pursuing any claim for the prize which, as indicated, had been deposited with the court for distribution.

Finally, Lucas argues that the enhanced interest provisions of sec. 807.01(4), Stats., apply only to parties "against whom a money judgment is recovered," and that because the $150,000 was paid into court by *Reader's Digest,* the statute cannot apply to him for he has never been adjudged personally liable to Warren in any amount. He bases his argument on the following sentence in sec. 807.01(4): "Interest under this section is in lieu of interest computed under ss 814.04(4) and 815.05(8)." The referenced statutes are the general provisions governing awards of postverdict and postjudgment interest. And while we agree with Lucas that they do indeed apply to persons against whom judgments have been entered, we see the reference to them in sec. 807.01, as doing no more than indicating that the special "offer of settlement" interest provisions of sec. 807.01 are in lieu of, rather than cumulative to, the general interest provisions of the cited statutes.

The purpose of sec. 807.01, Stats., is to encourage the pretrial settlement of cases that would otherwise be an unnecessary drain on judicial time and resources. *White v. General Cas. Co.,* 118 Wis. 2d 433, 439, 348 N.W.2d 614, 617 (Ct. App. 1984). "The plain language of [secs. 807.01(3) and (4)] indicates that double costs and additional interest are recoverable if an . . . offer of settlement . . . is rejected . . . and [the offering party] is subsequently awarded a [more favorable] judgment." *Id.* at 438, 348 N.W.2d at 617. That is precisely what happened here. The only parties to the action making any claim to the escrowed funds when the settlement offer was made were Lucas and Warren. Each sought a judgment awarding him or her the entire $150,000; and Warren, after her offer to settle the two countervailing claims was rejected by Lucas, received the judgment she

sought—which was, of course, more favorable than the one Lucas had earlier rejected. We see nothing in the language of secs. 807.01(3), (4) and (5), or in the arguments advanced by Lucas, that would cause us to question the trial court's award of costs.

*By the Court.*—Judgment and order affirmed.