JoAnn KATZMAN, and William Katzman, Plaintiffs-Respondents,

v.

STATE of Wisconsin ETHICS BOARD, and James E. Doyle, Attorney General of the State of Wisconsin, Defendants-Appellants.

Court of Appeals

*No. 98–2884. Submitted on briefs February 26, 1999.—Decided May 6, 1999.*

(Also reported in 596 N.W.2d 861.)

On behalf of the defendants-appellants, the cause was submitted on the briefs of *Alan Lee,* assistant

attorney general with whom on the briefs was *James E. Doyle,* attorney general.

On behalf of the plaintiffs-respondents, the cause was submitted on the brief of *Robert H. Friebert* and *Matthew W. O'Neill* of *Friebert, Finerty & St. John, S. C.,* of Milwaukee.

Before Dykman, P.J., Eich and Deininger, JJ.

DEININGER, J.   The State of Wisconsin Ethics Board and Attorney General James Doyle appeal a decision and order which granted declaratory and injunctive relief to JoAnn and William Katzman.[1] William is a lobbyist. The circuit court concluded that the statute prohibiting lobbyists from making contributions to incumbents and candidates for partisan elective state office, except during a specified period preceding general elections, "cannot be violated by a political contribution made by a lobbyist's spouse from marital funds."[2] The court thus enjoined the board "from investigating political contributions made by JoAnn Katzman except to the limited extent necessary to determine whether she made any such contributions from William Katzman's separate property." The board contends the trial court erred because it must be

---

[1] The Ethics Board is charged with the responsibility of administering state laws regulating the conduct of lobbyists. *See* § 13.685, STATS. The attorney general, "at the request of the board, may commence" civil actions to obtain forfeitures and license revocations for violations of lobbying regulations, and he or she may "upon information" commence criminal actions for violations for which criminal penalties are provided. *See* § 13.69(8), STATS. We will refer to the defendants-appellants in this opinion, collectively, as "the board."

[2] *See* § 13.625(1)(c), STATS., which is quoted and discussed below in the text of this opinion.

allowed to investigate possible lobbying law violations accomplished by a lobbyist acting through an agent, and that its investigation into JoAnn's political contributions does not infringe impermissibly upon her constitutional rights. We reject the board's contentions and affirm the circuit court's order.

## BACKGROUND

William Katzman is a lobbyist, licensed by and registered with the board to engage in "lobbying," that is, "attempting to influence legislative or administrative action by oral or written communication with any elective state official, agency official or legislative employe." Section 13.62(10), STATS.; *see also* §§ 13.63 and 13.64, STATS. His wife, JoAnn, is not a lobbyist.

Section 13.625(1)(c), STATS., provides in relevant part as follows:

> Except as permitted in this subsection, [no lobbyist may] make a campaign contribution, as defined in s. 11.01(6), to a partisan elective state official for the purpose of promoting the official's election to any national, state or local office, or to a candidate for a partisan elective state office to be filled at the general election or a special election, or the official's or candidate's personal campaign committee. A campaign contribution to a partisan elective state official or candidate for partisan elective state office or his or her personal campaign committee may be made in the year of a candidate's election between June 1 and the day of the general election. . . .

The period preceding an election during which lobbyists may contribute to candidates for partisan elective state offices is commonly referred to as "the window." The board has taken the position that a lobbyist's

285

spouse is not barred from making political contributions outside the window "merely because the individual is married to a lobbyist." It has also advised, however, that "a lobbyist may not evade the restrictions of the lobbying law by making a campaign contribution via a spouse."

The board has given examples to demonstrate the difference between a political contribution by a lobbyist's spouse which it deems permissible, and one that the board believes violates the law because the spouse is "acting as the mere agent of the lobbyist." It is permissible, according to the board, for a lobbyist's spouse "who has an established history of active participation in political campaigns, of her own volition" to make a political contribution outside of the window, "even if the contribution comes from marital property." However, if a lobbyist asks a spouse, "who has no particular interest in politics, to make a campaign contribution . . . indicating that [the lobbyist] cannot do so . . . because of the lobbying law," the spouse is "acting as the mere agent of the lobbyist, in all probability utilizing marital property funds."

Pursuant to its powers under § 19.49, STATS., the board authorized its staff to investigate whether there was probable cause to believe William Katzman had violated § 13.625(1)(c), STATS. It ordered the investigation based on information gathered from campaign finance reports on file with the State Elections Board showing that, both before and after the window period for the November 1994 general election, JoAnn had made numerous contributions to incumbent legislators of both parties, while during the window period, she made relatively few contributions and William made

many.[3] The board's resolution authorizing the investigation also authorized its staff to use its power under § 19.50, STATS., to subpoena "lobbyists, officials, candidates, or other individuals" to provide testimony and documents, and to "investigate any action or activity related to the investigation's purpose."

Attorneys for the board issued subpoenas to both William and JoAnn, requiring each of them to appear for a deposition and bring with them copies of checks issued for political contributions, check registers, day books and calendars showing political fundraisers attended, and the names of all banks where the Katzmans held personal or business accounts, all for the period under scrutiny before and after the 1994 general election.[4] The Katzmans filed this action, seeking declaratory and injunctive relief, claiming that the board erred in its interpretation that § 13.625(1)(c), STATS., restricts the political contributions of lobbyists' spouses, and that the board's interpretation and its investigation of JoAnn violated her rights under the First, Ninth, and Fourteenth Amendments of the U.S. Constitution.

The parties filed cross-motions for summary judgment. In support of their motion, the Katzmans filed

---

[3] JoAnn apparently made twenty-seven contributions to legislators before the window opened for the 1994 general election, only four during the window period, and another twelve after the window closed following the election. William made twenty-nine contributions, all during the window period. JoAnn's contributions were divided among eight Republican and fifteen Democratic legislators.

[4] The board subsequently withdrew the first subpoena it had issued to JoAnn, but apparently then re-issued it and sought to depose her while this matter was pending in the trial court.

excerpts from transcripts of depositions taken by the board of three other lobbyists, and one spouse of a lobbyist, as part of the board's investigation into contributions made by spouses of lobbyists. These excerpts indicate that attorneys representing the board had asked a lobbyist's spouse the following questions, among many others:[5]

Q   Do you do any work in any capacity other than, let's say, as a homemaker?

Q   Have you been affiliated with any political party?

Q   And which one is that?

Q   Were you a formal member of the party?

Q   Okay. Would you say that your political philosophy leans toward one party or the other at this time?

Q   Have you contributed to any — party candidates since 1978?

Q   And is there a reason that maybe you've changed your philosophy since you left the party?

Q   Have you worked actively for any political campaigns in the last four years?

Q   What made you decide to contribute to that person at that time?

Q   Has your husband had any influence on you in any way in your decisions to either make or not make a political contribution to any candidate?

_____

[5] The transcripts in the record were redacted to delete the names of lobbyists, spouses, legislators and political parties. The redactions are indicated in our quotation by "—".

Q   Why on that particular day did you choose, of all days, to give or transmit that contribution to — if you could answer it?

Q   Is there any political issue that he was involved in that made you decide to contribute to him?

Q   Aside from — has anybody else in any way influenced your decision as far as who you would contribute to?

Q   On what basis do you distinguish those [legislators] that you have contributed to and those that you haven't?

Q   Have you ever discussed your political philosophy with any other person besides your husband—?

The excerpts also show that a lobbyist was asked the following questions during a deposition:

Q   Has your wife ever discussed in your presence and in the presence of third parties her political philosophies?

Q   Can you give me a general summary of what she may have said?

The trial court concluded that the board's investigation of JoAnn Katzman's contributions would likely result in similar questions being asked of JoAnn and William by a representative of the board, and that "[t]his type of questioning of either plaintiff regarding JoAnn Katzman's campaign contributions intrudes upon her First Amendment rights to speech and association." The court concluded further that if the answers to this type of questions "would provide no basis for bringing a civil or criminal action against [William], obviously there is no legitimate government interest, much less a compelling one, justifying the investigation." Noting that a court should attempt to construe a

statute in a manner that avoids rendering it unconstitutional, the court determined that § 13.625(1)(c), STATS., "cannot be violated by a political contribution made by a lobbyist's spouse from marital funds." Thus, according to the trial court:

> Any investigation of the contributing spouse's political beliefs and practices is pointless and irrelevant. It makes no difference whatsoever what beliefs the contributor holds, nor what his or her contribution practices have been in the past. It makes no difference if the contributor's spouse advised, counseled or even ordered the contributor to make the contribution.

The board appeals the trial court's decision and order, which declared that contributions by a lobbyist's spouse, made from marital funds, cannot violate the lobby law, and enjoined the board "from investigating political contributions made by JoAnn Katzman except to the limited extent necessary to determine whether she made any such contributions from William Katzman's separate property."[6]

## ANALYSIS

We review the granting and denial of motions for summary judgment de novo, applying the same methodology and standards as the trial court. *See Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816, 820 (1987). If there are no disputed issues of material fact, summary judgment is proper where the moving party is entitled to judgment as a matter of

---

[6] The trial court also concluded that the Katzmans' claims were "ripe for review and appropriate for declaratory relief." The board does not challenge this conclusion on appeal.

law. *See id.* When both parties move for summary judgment and neither argues that factual disputes bar the other's motion, the " 'practical effect is that the facts are stipulated and only issues of law are before us.' " *See Lucas v. Godfrey*, 161 Wis. 2d 51, 57, 467 N.W.2d 180, 183 (Ct. App. 1991) (citation omitted). Similarly, the proper interpretation of a statute and its application to undisputed facts is a legal question subject to de novo review. *See Minuteman, Inc. v. Alexander*, 147 Wis. 2d 842, 853, 434 N.W.2d 773, 778 (1989). Even though our review is de novo, we may benefit from the trial court's thorough and thoughtful analysis of the legal questions presented in this appeal. *See State v. Isaac J.R.*, 220 Wis. 2d 251, 255, 582 N.W.2d 476, 478 (Ct. App. 1998).

We conclude that the trial court correctly interpreted the statutes in question. Section 13.625(1)(c), STATS., contains no prohibition against a lobbyist's spouse making political contributions, from any source, at any time. The conduct of a lobbyist's spouse is not addressed at all in any of the lobby law provisions of chapter 13. Section 13.625(1)(c) specifically refers to § 11.01(6), STATS., for the definition of a campaign "contribution," which a lobbyist may make to a state elected official or candidate, but only during the period the lobbyist contribution window is open. We thus deem it appropriate, as did the trial court, to consult other provisions of chapter 11, which governs campaign financing, to determine what is and what is not permissible with respect to the making of campaign contributions.

Section 11.24(1), STATS., provides, among other things, that "[n]o person may, directly or indirectly, furnish funds or property to another person for the purpose of making a contribution in other than the

person's own name." Thus, it is clear that neither a lobbyist nor any one else may "furnish funds" to another person for subsequent transfer to a candidate, in an effort to disguise the true source of a political contribution. *See State v. Dreske*, 88 Wis. 2d 60, 78–79, 276 N.W.2d 324, 333–34 (Ct. App. 1979). We conclude, however, that when a married person makes a contribution to a candidate from his or her marital property, the person does so with his or her own funds, which means that the funds were not "furnished" by his or her spouse within the meaning of § 11.24(1), STATS.

██ The board itself has defined "furnish" to mean "to provide or supply with," implying the presence of an intent and action to transfer items to another.[7] We accept the board's definition for the purpose of our present analysis. Section 766.31, STATS., specifies that: (1) "[a]ll property of spouses is marital property except that which is classified," by statute or agreement, as the individual property of one of the spouses; (2) "[a]ll property of spouses is presumed to be marital property"; and (3) "[e]ach spouse has a present undivided one-half interest in each item of marital property." Thus, no gift, conveyance or special form of holding title is required in order to create marital property. Each spouse acquires a present, undivided ownership interest in an item of marital property as soon as it comes into the hands of either spouse, with no particular intent or action being required of the spouse who earns or physically receives the property "to provide or

[7] In 1996 Wis. Eth. Bd 5, the board adopts a definition of "furnish" from WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1986), "to provide or supply with what is needed, useful, or desirable," and notes that "Wisconsin courts have adopted that ordinary usage."

supply" the property to the other spouse. The earning or receiving spouse thus cannot "furnish" marital property to the other spouse—the law has already created each spouse's undivided ownership of marital property.

A spouse "acting alone" may manage and control any marital property held in that spouse's name, or in the names of both spouses "in the alternative," e.g., husband "or" wife. *See* § 766.51, STATS. Thus, one spouse may generally expend marital funds he or she controls, solely or jointly, as he or she sees fit. If marital funds were deemed "furnished" from one spouse to the other, any campaign contribution made by a married person could constitute a potential violation of § 11.24(1), STATS., especially if the non-contributor spouse encouraged the contribution and was aware that it was being made from marital funds. We conclude that this interpretation would be unrealistic and impractical, and we thus reject it. *See Maxey v. Redevelopment Auth.*, 120 Wis. 2d 13, 20, 353 N.W.2d 812, 816 (Ct. App. 1984) (noting that unrealistic and unreasonable interpretations of statutes are to be avoided).

The interpretation we reject is essentially the interpretation the board has adopted in attempting to enforce § 13.625(1)(c), STATS., against lobbyists whose spouses have made contributions outside the window period. The board's interpretation prompted its inquiries into the subjective motivations, political philosophies and history of political activities of lobbyists' spouses, producing a result which the trial court accurately described as follows:

> The Board's inability to define exactly what behavior of a lobbyist's spouse violates the law has lead them down a path fraught with constitutional peril, forcing individuals who are not even subject to

the lobbying law to undergo coerced questioning about their political beliefs and practices.

The board has not argued that its statutory interpretation is entitled to deference from a reviewing court, and even if it were to have so argued, we would conclude that the interpretation it endorses is unreasonable.

The arguments the board makes in this appeal do not directly challenge the trial court's reasoning in interpreting §§ 11.24(1), 13.625(1)(c) and 766.31, STATS., as it did. Rather, the board asserts that lobbyists should not be permitted to violate the lobby law by acting through agents; that § 13.625(1)(c), STATS., is not unconstitutional; and that the board is not precluded from investigating violations of the statute, even if that means interrogating spouses of lobbyists concerning possible concerted actions to violate the lobby law. Neither we nor the Katzmans take serious issue with these assertions. The board's arguments, however, do not explain why the trial court's interpretation of the statutes is incorrect, or why the board's interpretation (that political contributions made outside the window by a lobbyist's spouse from marital funds may or may not be illegal depending on the spouse's history of participation in political activities) is legally sound. Throughout its brief the board simply presumes that if a lobbyist asks his or her spouse to make a political contribution from marital funds outside the window period, the lobbyist has violated the statute via an agent.[8] But, as we have discussed, the only relevant

---

[8] For example, the board makes the following argument:

The disclosure requirements that serve these compelling state interests are meaningless unless the authorities can investigate to determine whether the disclosures are truthful and accurate. The supreme court has held that voters and constituents are entitled to know who is giving money to candidates. They are entitled to know

statutory proscription relating to the use of agents in making political contributions prohibits the furnishing of funds in order to disguise the source of a contribution. The board offers no rationale as to why spouses should be deemed to "furnish" marital property to one another.

We acknowledge that the appealed decision and order did not declare § 13.625(1)(c), STATS., to be unconstitutional, either on its face or as the board seeks to apply it, and the Katzmans do not ask us to make such a declaration.[9] We note in passing, however, that any regulatory statute which is construed to require, or even to permit, agents of the government to ask ques-

if and when a lobbyist is contributing to a candidate. If married lobbyists are exempt from that restriction because they can contribute in the spouse's name, neither the election laws nor the lobby laws can be enforced against any married lobbyist.

This argument presumes that a contribution made by a married person from marital funds is actually a disguised contribution from the person's spouse, and does not explain why such a contribution should not be deemed to be that of the person making it.

Similarly, the board accuses the Katzmans of "arguing that a lobbyist can conceal illegal conduct behind his or her marriage veil, because the constitution precludes investigation." Again, this rhetoric presumes that contributions made by a lobbyist's spouse from marital funds outside the window period constitutes illegal conduct but does not explain why this should be so.

[9] It is true, as the board notes, that the Katzmans alleged in the trial court that the board's application of § 13.625(1)(c), STATS., to married lobbyists and their spouses is unconstitutional on several grounds. The question before us is whether the trial court correctly interpreted the lobby law, in light of the relevant provisions of the campaign financing law and the marital property law. The Katzmans concede that the constitutional issues need not be reached if we uphold the trial court's interpretation, which we do.

tions of a citizen such as those we have quoted above, is constitutionally suspect. *See Buckley v. Valeo*, 424 U.S. 1, 25, 64 (1976) (concluding that "[i]n view of the fundamental nature of the right to associate, governmental 'action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny,' " citing *NAACP v. Alabama*, 357 U.S. 449, 460–61 (1958), and holding that "we have repeatedly found that compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment."). The statutory interpretation embraced by this court and the trial court, however, makes it unnecessary to decide whether the board's interpretation and application of the statute to its investigation of JoAnn Katzman's contributions infringe upon her constitutional rights. *See State v. Bertrand*, 162 Wis. 2d 411, 415, 469 N.W.2d 873, 875 (Ct. App. 1991) ("There is a strong presumption that statutes are constitutional, and the court of appeals will construe a statute to preserve its constitutionality if it is at all possible to do so.").

The board also implies that the interpretation we adopt may itself be unconstitutional because, according to the board, it permits married lobbyists to evade § 13.625(1)(c), STATS., while unmarried lobbyists do not have a similar opportunity, thereby violating the equal protection rights of single lobbyists. We find little merit in this argument. The board has determined that lobbyists may, outside the window period, advise members of a lobbying organization and their employees to make political contributions to state elected officials and candidates. Presumably, this means that a lobbyist, married or single, may also advise or encourage other persons—such as friends, neighbors or relatives—to make political contributions from their

own funds. The fact that a married lobbyist has one more relative he or she may advise to make political contributions than does a single lobbyist, results from the lobbyist's individual decision to marry or not. The distinction does not arise because of our interpretation of the statute. In any event, neither a single nor a married lobbyist may "furnish funds" to another person in order to accomplish and disguise political contributions outside the window period. (The appealed order does not enjoin the board from pursuing an investigation into whether William transferred funds from his individual property to JoAnn for the purpose of disguising contributions.)

■■

It appears that the board's chief complaint is with the marital property law itself. The board at one point describes that law as creating a "large loophole" for married lobbyists. Many of the board's arguments imply that a lobbyist-spouse should be presumed to be the principal income earner in a household, and thus the "true owner" of funds which become marital property. Such a presumption would be contrary to the policy and legislative intent which lie behind Wisconsin's marital property law. In Wisconsin, spouses are presumed to be equal contributors to the accumulated wealth of a marriage, regardless of whether their contributions are principally made inside or outside the home. *See, e.g.,* §§ 765.001(2) and 767.255(3)(d), STATS.

In this same vein, the board argues that the interpretation we adopt, through operation of the marital property law, would "automatically" make *all* contributions by lobbyists' spouses outside the window illegal because every spousal contribution from marital funds would represent a contribution as well by the lobbyist. We reject this notion as well. The board concedes that

the Federal Elections Commission, regardless of state community or marital property laws, regards each contribution made by a married person to be made by the person signing the check, unless otherwise specified.[10] Similarly, the board notes in its brief that "the contribution limitations of Wis. Stat. Ch. 11 apply separately to husband and wife, no matter the source of the funds." The operative words in § 13.625(1)(c), STATS., are "make a campaign contribution," and under the board's own concessions, the spouse who signs the contribution check is deemed the maker of the contribution by those charged with administering campaign financing laws.

Finally, the board assails the trial court's order for undermining the integrity of the Lobby Law and hampering the board in its efforts to enforce the law. The board's argument here is essentially that its interpretation of § 13.625, STATS., and its consequent investigations of lobbyists' spouses under that interpretation, are necessary lest the legislative purpose behind restricting the time period during which lobbyists may make campaign contributions be eviscerated. A "loophole-closing" provision, if deemed necessary to prevent circumvention of proper regulations, may justify some infringement of First Amendment rights if it is narrowly tailored and furthers the state's interest in

---

[10] *See Invitations to Reception and Contributions in Community Property State*, Federal Election Campaign Financing Guide (CCH) ¶ 5527 (Aug. 12, 1980) (AO 1980–67). The Wisconsin State Elections Board has adopted a similar policy: "Contributions received in the form of a check drawn on a joint checking account may be assumed to be from the signer of the check absent evidence to the contrary." Election Board Opinion 75–5 (Dec. 19, 1975).

preventing corruption or the appearance of corruption. *See Buckley v. Valeo*, 424 U.S. 1, 38, 44–46 (1976); *Gard v. State Elections Bd.*, 156 Wis. 2d 28, 58–60, 456 N.W.2d 809, 823–24 (1990).

We conclude, however, as did the Supreme Court in *Buckley* with respect to a limitation on "independent expenditures," that even if the board's interpretation of the reach of § 13.625(1)(c), STATS., were correct, it would be difficult to justify as the permissible closing of a loophole. Under present board interpretations and court decisions, a Wisconsin lobbyist may do all of the following:

(1)  personally contribute to incumbents and candidates for state elected office during the window period preceding each general election;

(2)  contribute to political party and "legislative campaign" committees at "any time";[11]

(3)  advise members of a lobbying organization, or their employees, to make contributions to individual candidate committees, "without restriction";

(4)  advise a political action committee associated with his or her principal to make contributions to candidate committees at times outside the lobbyists' window; and

(5)  provide "uncompensated personal services . . . on behalf of candidates for elective state office." *See Barker v. Wisconsin Ethics Bd.*, 841 F.Supp. 255, 264 (W.D. Wis. 1993).

---

[11] "Legislative campaign committees" are operated by the partisan caucuses in the two houses of the Wisconsin Legislature. The four committees receive and expend funds to assist candidates and incumbents seeking election or re-election to the legislature. *See* §§ 11.01(12s) and 11.265, STATS.

Furthermore, the board acknowledges that a lobbyist's spouse may make contributions outside the window, from marital funds, provided he or she has a history of political activism. And, based on its arguments in this appeal, it appears that the board might also conclude that a lobbyist's spouse may make contributions outside the window from individual funds, even without such a history. Thus, we conclude that lobbyists have no dearth of opportunities to legally convey their own and their principals' political support for state elected officials and candidates, both inside and outside the window period. We fail to see what significant additional protection from real or apparent corruption would be afforded by the board's proffered interpretation of § 13.625(1)(c), STATS., especially in view of the constitutional concerns that interpretation raises.[12]

## CONCLUSION

For the reasons discussed above, we affirm the decision and order entered by the circuit court.

*By the Court.*—Order affirmed.

---

[12] Some of those interested in reforming campaign finance and related regulations have commented that the real problem with present laws and regulations does not stem from what is illegal, but from what is presently legal. It may well be that the evil the board maintains it is attempting to prevent with its current interpretation of § 13.625(1)(c), STATS., will not be fully vanquished until the reliance of candidates on "special interest" campaign contributions is reduced or eliminated. Numerous proposals to accomplish that end are presently being debated at both the state and federal levels.