Todd DEMINSKY, Plaintiff-Respondent-Petitioner,

v.

ARLINGTON PLASTICS MACHINERY, Locator Corporation, Alpha Omega Plastics Company, Conair, Inc., and Steadfast Insurance Company, Defendants,

IMAGE PLASTICS, INC. and Federated Mutual Insurance Company, Defendants-Appellants-Petitioners. †

Supreme Court

*No. 01–0242. Oral argument September 10, 2002.—Decided March 6, 2003.*

2003 WI 15

(Also reported in 657 N.W.2d 411.)

† Motion for reconsideration denied 5-9-03.

589

590

For the defendants-appellants-petitioners, there were briefs by *Laura J. Hanson, Katherine A. McBride* and *Meagher & Geer P.L.L.P,* Minneapolis, Minnesota, and oral argument by *Laura J. Hanson.*

For the plaintiff-respondent-petitioner, there were briefs by *John P. Richie* and *Richie, Wickstrom & Wachs, LLP,* Eau Claire, and oral argument by *John P. Richie.*

¶ 1. JON P. WILCOX, J. In this case we review a published decision of the court of appeals, *Deminsky v. Arlington Plastics Machinery,* 2001 WI App 287, 249 Wis. 2d 441, 638 N.W.2d 331, which reversed and remanded a summary judgment order of the Barron County Circuit Court, Edward R. Brunner, Judge. Two issues are presented to this court. First, we must determine whether an indemnity agreement is valid and enforceable under the circumstances presented. Second, if the provision is valid, we must decide the extent to which an indemnitor is bound by a settlement agreement reached between the plaintiff and the indemnitee before trial.

¶ 2. The plaintiff in this case, Todd Deminsky (Deminsky), sued Arlington Plastics Machinery, Inc. (Arlington) when he was injured while using a grinding machine sold by Arlington to Deminsky's employer, Image Plastics, Inc. (Image). When Deminsky learned that there was an indemnification agreement between Arlington and Image in the contract for the sale of the machine, he impleaded Image and its insurer, Federated Mutual Insurance Company (Federated).[1] Deminsky and Arlington then reached a settlement agreement. The circuit court approved the stipulated judgment and entered judgment against Arlington. The agreement

---

[1] We will refer to the appellant-petitioners, Image and Federated, as Image, except where it is necessary to separately identify the parties. Image, Federated, and Deminsky are the only parties to this review. Arlington and all others named as defendants in the caption are not participating.

assigned Arlington's indemnification claims to Deminsky. Deminsky amended his complaint to include an indemnification claim against Image. Both parties then moved for summary judgment. The circuit court granted Deminsky's motion for summary judgment and awarded him the full amount of the judgment ordered against Arlington, plus interest and costs. Image appealed. The court of appeals upheld the circuit court's finding that the indemnity agreement was valid, but reversed and remanded the case, finding that Image should not be bound by the terms of the stipulation reached by Deminsky and Arlington. The court of appeals believed Image should be afforded a full trial on the issues of liability and damages. We agree that the indemnity provision in the sales contract between Image and Arlington is valid. We also agree that Image may not be bound to the terms of the settlement agreement, but find that the scope of the remand should be limited because Image rejected the tender of the defense.

¶ 3. Accordingly, we affirm the holding of the court of appeals and remand the case to the circuit court for a limited court trial on the issue of whether the settlement agreement reached is reasonable and not the product of fraud or collusion. If the circuit court finds that the settlement agreement is reasonable and there was no fraud or collusion, then the judgment against Image will stand. However, if the circuit court finds that the settlement agreement was unreasonable or involved fraud or collusion, then the parties will be back to the position they were in before any settlement agreement was reached between Deminsky and Arlington. That means that the parties will be headed for a trial on Arlington's liability and damages. Unlike before, though, Image will have the benefit of this court's

opinion and know that the indemnity agreement in its contract with Arlington is valid and binding upon them.

## I

¶ 4. For purposes of this review, the parties agree on the following facts. Image is a Wisconsin corporation that recycles and reprocesses plastic. In 1995, one of Image's customers asked it to grind up plastic snow fencing. However, Image had no machine suitable for such a purpose. The owner of Image, Gregory Harm, determined that new machines were too expensive and decided to seek an appropriate used machine. Harm contacted John Clarke, the president of Arlington Plastics Machinery, an Illinois corporation that buys and sells used plastics processing equipment. Arlington was the closest of the available suppliers. Image had purchased equipment from Arlington on prior occasions. Clarke told Harm that he had a machine that might work.

¶ 5. On November 3, 1995, Harm drove to Elk Grove Village, Illinois, to meet with Clarke at Arlington's plant and inspect the machine. He took some of the snow fencing along with him to test on the machine. After inspecting the machine, Harm gave Clarke a verbal order, agreeing to purchase the machine. Clarke then had an administrative assistant type up the sales order containing the purchase price and other terms of the sale. While Arlington's sales orders are typically mailed to customers, Clarke may have given Harm the paperwork while he was there. Neither Clarke nor Harm recall exactly when or how the sales order was transmitted.

¶ 6. The sales order form was one page, front and back, with the terms and conditions listed on the back of the order. For purposes of this review, the relevant language included:

> ... WE [Arlington] ACCEPT YOUR ORDER ONLY ON THE EXPRESS CONDITION THAT YOU AS-SENT TO THE TERMS CONTAINED BELOW AND YOUR ACCEPTANCE AND RECEIPT OF THE GOODS SHIPPED HEREUNDER SHALL CONSTI-TUTE ASSENT TO SUCH TERMS.
>
> . . . .

**3 - BUYER'S INDEMNITY OF ARLINGTON.**

A. WARNING . . . Seller will not be responsible for any loss or injury resulting from defects in the items sold or from the subsequent use of the items. Buyer expressly agrees as a condition of the purchase of these items that it will indemnify and hold Seller harmless from any and all claims that may hereafter at any time be asserted by any subsequent owner or user of the items sold here-under or asserted by any agent or employee of such user or by any third party arising from any purported defect in the items or by reason of the use of these items. Purchaser agrees to assume all responsibility in connection with the goods upon delivery thereof to the customer or to a common carrier.

B. HAZARDS LIABILITY—Purchaser shall indemnify and hold harmless Seller . . . from and against any and all losses, expenses, demands, and claims made against Seller . . . by Buyer, any agent, servant, or employee of Buyer, any subsequent Purchasers . . . because of injury or illness (including death) . . . actual or alleged whether caused by the sole negligence of Seller, the concurrent negligence of Seller with Buyer, any agent, servant, or employee of Buyer, any subsequent Pur-chasers . . . resulting from, or in any way connected

with the operation, maintenance, possession, use, transportation, or disposition of the Articles . . . Buyer agrees to defend any suit action or cause of action brought against Seller, its agents, servants, or employees based on any such alleged injury, illness, or damage and to pay all damages, costs, and expenses including attorney's fees in connection therewith or resulting therefrom.

¶ 7. Clarke admits that he and Harm never verbally discussed the indemnity language included in the sales order, but he testified that Harm would have been instructed to look the order over, sign it, and return a signed copy to Arlington. Clarke filled out an "Estimate and Repair Order" on November 3rd to. have the machine cleaned, painted, and tested. On Monday, November 6, 1995, Harm signed the contract on behalf of Image and faxed the signed contract back to Arlington. Harm did not read the back of the contract, but he did flip over the contract and was aware that "Terms and Conditions" were on the back of the form from prior purchasing experience with Arlington. Harm signed the form directly below a warning about the terms on the back of the form:

> We offer to purchaser the following articles for the purchase price specified above and subject to the terms and conditions set forth on the reverse side of this Agreement and Offer. This Agreement shall become effective upon, but not until, execution by ARLINGTON PLASTICS MACHINERY, INC. AND PURCHASER. The terms and conditions on the reverse side are part of this agreement as effectively as though they precede the signature of the purchaser.
>
> AGREED

¶ 8. In late 1995, Image paid Arlington the $10,000 owed for the grinder. Image then transported

596

the grinder to its recycling plant in Rice Lake, Wisconsin. In order to recycle the plastic snow fencing, it had to be cut into small pieces. That was the purpose of the grinder. Arlington did not give Image an instruction manual or warnings regarding proper use. There was no sign on the machine warning the user that the guards should not be removed. The grinder had a problem with clogging and a metal guard box had to be unbolted and removed in order to unclog it. Employees found the process inconvenient and time-consuming. Because the grinder clogged repeatedly, the operators used the machine with the guard off at least some of the time. Some employees even refused to operate the machine, because they felt it was too dangerous.

¶ 9. On September 18, 1996, Todd Deminsky was seriously injured when his right hand and arm got caught in the gears of the grinding machine after his sweatshirt sleeve stuck in the machine while he was operating it. The guard was not in place on the machine at the time.

¶ 10. In May 1998, Deminsky brought suit against Arlington, alleging that the grinder was unreasonably dangerous and defective at the time that Arlington sold it to Image. Deminsky claimed that Arlington: 1) altered a guard on the grinder or caused the guard to be altered; 2) negligently designed, installed, and constructed the guard; and 3) allowed the grinder to be sold in such condition. Deminsky also claimed that Arlington was negligent.

¶ 11. Through discovery, Deminsky learned that there was an indemnification clause in the contract between Arlington and Image for the sale of the machine. Deminsky filed an amended complaint, adding Image and its liability insurer, Federated Mutual Insurance Company, as defendants in the case.

¶ 12. In a letter dated June 4, 1999, counsel for Arlington tendered the defense of Arlington in this case to Image based on the indemnification clause. Federated wrote a reply to both Image and Arlington. In a letter dated July 15, 1999, Federated informed Image:

> Federated will pay for Arlington's defense costs incurred in the Deminsky litigation under a reservation of rights.
>
> . . . If the indemnity agreement is valid under applicable law, the purchase order indemnification language meets the definition of an "insured contract" as that term is defined in Federated's general liability policy.
>
> . . . Image's obligation to provide Arlington a defense against the claims of the Deminsky lawsuit is covered under the Federated policy.
>
> . . . Federated will pay Arlington's defense costs only at the conclusion of the litigation . . . . Federated's decision to pay for Arlington's defense costs is made under a reservation of rights because, under both Wisconsin and Illinois law, the indemnity provision may prove invalid and void as against public policy . . . . In the event it is determined the contract is invalid under Wisconsin or Illinois law, Federated will refuse to pay Arlington's defense costs as the indemnity clause would no longer constitute an "insured contract."
>
> . . . .
>
> With respect to the Amended Complaint and Mr. Deminsky's direct claims against Image Plastics, Federated will defend Image Plastics under a complete

598

reservation of rights .... We will contact you shortly regarding assigning counsel to defend you on the Amended Complaint.[2]

¶ 13. On August 9, 1999, Image and Federated filed separate answers to the amended complaint, denying liability to Deminsky for his injuries. On that same day, Deminsky and Arlington entered into an assignment and indemnification agreement, a "Stipulation for Entry of Judgment." Arlington stipulated that it did not maintain liability insurance and that it faced potential liability given the claims made against it. The agreement also included statements that 1) there was a conflict in deposition testimony regarding whether the grinder had an interlock safety device when Arlington sold it to Image; 2) the disputed evidence "creates for Arlington a substantial exposure to liability"; 3) Arlington has "neither the assets or the anticipated cash flow to defend this case," and thus, "the defense costs alone would put Arlington into bankruptcy." The agreement noted Deminsky's injuries and damages, and set out the agreement between Deminsky and Arlington. Arlington withdrew its answer and consented to entry of judgment against it in the amount of $1.475 million, without costs. This amount is $25,000 less than Federated's $1.5 million limits. Arlington assigned to Deminsky "any and all claims it currently has or may have in the future, for contribution, [or] indemnity . . . against any other person or entity." Deminsky agreed not to execute the judgment against Arlington. Image was not involved in any part of the settlement agreement or the subsequent judgment ruling against Arlington.

---

[2] A copy of this letter was also sent to Arlington's counsel.

¶ 14. Deminsky amended his complaint again to include the indemnity claim against Image. Subsquently, the parties filed cross-motions for summary judgment. On December 13, 2000, the circuit court entered judgment for Deminsky against Image for the full amount of the Arlington judgment, plus interest and costs. Image appealed. The court of appeals upheld the circuit court's ruling that the indemnity provision was valid and enforceable, but reversed and remanded the case to the circuit court to allow Image the opportunity for a full trial on liability and damages. Both Image and Deminsky now appeal to this court.

## II

¶ 15. We review a grant of summary judgment by using the same standards as the circuit court applied in making its initial determination. *Verdoljak v. Mosinee Paper Corp.,* 200 Wis. 2d 624, 630, 547 N.W.2d 602, 604 (1996). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Wis. Stat. § 802.08(2) (1995–96). Where no material facts remain in dispute, this court determines which party is entitled to judgment as a matter of law. *See Doyle v. Engelke,* 219 Wis. 2d 277, 283, 580 N.W.2d 245 (1998). We review these issues de novo, without deference to the trial court's decision. *Lucas v. Godfrey,* 161 Wis. 2d 51, 56, 467 N.W.2d 180 (Ct. App. 1991). Interpretation of a contract is a question of law which this court reviews de novo. *Yauger v. Skiing Enter., Inc.,* 206 Wis. 2d 76, 80, 557 N.W.2d 60 (1996).

## III

¶ 16. As noted, there are two issues presented for this court to review. The first issue is whether the court of appeals erred in finding that the indemnity provision in the sales contract between Arlington and Image is valid and enforceable. Image claims that the indemnity provision is void as against public policy and unconscionable. The parties no longer contest the creation of the contract, including when the contract between Image and Arlington arose for the sale of the machine and what its terms were. The court of appeals stated that whatever the timing of the agreement reached, the indemnity provision was part of the contract.[3] Since the parties no longer dispute what the terms of the contract were, we now take on only the issues of whether the provision is valid and enforceable. Image claims, specifically, that the contract is void because the indemnity clause violates public policy by delegating the nondelegable duty to produce a safe product and is unconscionable because of a lack of notice and conspicuousness of the indemnity clause.

¶ 17. We begin by examining the question of which state law applies to this contractual agreement. The parties agree that the Uniform Commercial Code (Code) governs the transaction between them, and that both Wisconsin and Illinois have adopted the Code. Deminsky argues that because the contract contains a choice of law provision specifying that the contract would be subject to Illinois law, under the Code, Illinois law should be used to determine the validity of the

---

[3] At oral argument, counsel for Image and Federated was asked specifically whether the "there is no contract" argument was settled by the court of appeals, and counsel's reply was, "That's correct."

601

contract.[4] Image, on the other hand, argues that the clause violates fundamental public policies of Wisconsin that established strict liability for manufacturers in products liability cases, and therefore Wisconsin law should apply.

¶ 18. Wisconsin Stat. § 401.105(1) (1995–96) allows that parties to a contract may agree that the law of a particular jurisdiction will apply to that contractual relationship.[5] In *Bush v. National School Studios, Inc.,* though, this court recognized that while Wisconsin allows parties the freedom to stipulate to applicable law in a contract, such stipulations would not be allowed "at the expense of important public policies of a state whose law would be applicable if the parties choice of law provision were disregarded." 139 Wis. 2d 635, 642, 407 N.W.2d 883 (1987). The petitioner in *Bush* was a student portrait photographer who was terminated by the corporation with which he had an employment contract. *Id.* at 637–40. The photographer sued, alleging, among other things, that the termination violated

---

[4] One of the provisions listed with the "Terms and Conditions" on the back of the contract states: "**10 - MISCELLANEOUS**. This contract and all causes of action relating to the sale is to be construed according to the laws of the State of Illinois."

[5] Wisconsin Stat. § 401.105(1) provides, in relevant part:

> Territorial application of chs. 401 to 411; parties' power to choose applicable law. (1) ... [W]hen a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties.

All subsequent references to the Wisconsin Statutes are to the 1995–96 version unless otherwise indicated. There have been no material changes to this statute; however, the contract at issue in this case was created in 1995.

602

the Wisconsin Fair Dealership Law (WFDL). *Id.* at 640. This court held that although the parties agreed that Minnesota law would apply to the contract, because the Wisconsin Legislature declared the WFDL fundamental policy and explicitly prohibited the protections from being varied by contract, the choice of law provision could not be enforced. *Id.* at 641–42, 644–45. Minnesota law·may have had some protection for unfair termination of franchises, but it did not have an equivalent Fair Dealership Law. *Id.* at 641 ("[The petitioner] in fact concedes that Minnesota and Wisconsin law are not co-extensive."). Unlike *Bush,* however, where the protection from another state's law was "highly debatable," in this case, the protection should be equal. Illinois employs the Code, and Illinois has recognized the rule of strict liability for products liability cases. *See Chicago Steel Rule and Die Fabricators Co. v. ADT Security Systems, Inc.,* 763 N.E.2d 839, 843–44 (Ill. App. Ct. 2002) (discussing the Illinois Supreme Court's adoption of the rule of strict liability in tort for defective products, based on the provisions of Restatement (Second) of Torts § 402A (1965), and the policy reasons for acceptance of such a rule). Wisconsin adopted the rule of strict liability in *Dippel v. Sciano,* 37 Wis. 2d 443, 459, 155 N.W.2d 55 (1967).

¶ 19. Both states also allow indemnity contracts that cover the indemnitee's own conduct. *Freislinger v. Emro Propane Co.,* 99 F.3d 1412, 1420 (7th Cir. 1996) (stating, "Illinois law does not require indemnity contracts to contain an express provision providing for the coverage of the indemnitee's own negligence in order for them to be enforceable"); *Dykstra v. Arthur G. McKee & Co.,* 100 Wis. 2d 120, 124–25, 301 N.W.2d 201 (1981) (confirming that "an indemnity contract which agreed to indemnify a party·against its own negligence

603

is not against public policy, but [it would not be so construed] unless it is apparent that such result was clearly intended").[6]

¶ 20. Deminsky argues that even if Wisconsin law is applied in this case, the provision is enforceable. We agree and conclude that the decision whether the provision is valid would be the same under the law of either state. Accordingly, we apply Wisconsin law. *See Sharp v. Case Corp.*, 227 Wis. 2d 1, ¶ 17, 595 N.W.2d 380 (1999) ("If the laws of the two states are the same, we apply Wisconsin law.").

¶ 21. We first address Image's claim that the indemnity provision effects a shift of a nondelegable duty to produce a safe product. In *Dippel,* this court examined and adopted the rule of strict liability for the seller of unreasonably dangerous products as found in Restatement (Second) of Torts § 402A. 37 Wis. 2d at 450–59. Image argues that to allow Arlington to rid itself of the financial responsibility for liability arising from the products that it sells essentially releases Arlington from the duty to create a safe product. We disagree. Wisconsin has recognized that the rule of strict tort liability means that the duty to design and manufacture ·a safe product may not be delegated. *Shawver v. Roberts Corp.*, 90 Wis. 2d 672, 683, 280 N.W.2d 226 (1979) ("One who markets an unreasonably dangerous product is not entitled to expect that others

---

[6] *See also Owens v. Midwest Tank and Mfg. Co.*, 549 N.E.2d 774, 776 (Ill. App. Ct. 1989) (holding that under Illinois law, an agreement will not be construed as indemnifying a party against its own strict liability unless the language of an agreement clearly shows the parties' intent for such a result).

will make it safe."). However, as this court recognized in *Dykstra,* "to recite this maxim . . . is not explanatory of its meaning." 100 Wis. 2d at 130–31. Strict liability does not make the manufacturer or seller an insurer, nor does it impose absolute liability. *Shawver,* 90 Wis. 2d at 681. In *Dykstra,* this court rejected a claim that an indemnification agreement shifted the nondelegable duties of an employer or owner under the safe place statute. *Dykstra,* 100 Wis. 2d at 130–31. The court explained:

> Ahern in this case contends that [nondelegable duty] means that the ultimate financial liability for damages occasioned by the violation of the safe place statute must rest upon the party who violates the safe place statute. Ahern contends, therefore, that the financial exoneration of McKee, who had the statutory safe place duty, violates public policy. We conclude, however, that this shifting of responsibility through either the principles of common law indemnity or contractual indemnity is not what is meant by the statement that the duties under the safe place statute are nondelegable. . . .
>
> . . . .
>
> All that is meant by the statement that duties under the safe place statute are nondelegable is that the person who has that duty cannot assert that another to whom he has allegedly delegated the duty is to be substituted as the primary defendant in his stead for a violation of safe place provisions. Under any circumstance, it is the owner or the employer who must answer to the injured party. *Whether that owner is to be made financially whole from another source by principles of law or contract is an entirely different question.*

*Id.* at 131–32 (emphasis added).

¶ 22. We hold that the same is true for the non-delegable duty to design and manufacture a reasonably safe product. This court has held that agreements to indemnify a party against its own negligence must be strictly construed, but so long as that standard is met, such agreements are valid. *Id.* at 124–26, 134–35; *Barrons v. J.H. Findorff & Sons, Inc.*, 89 Wis. 2d 444, 452, 278 N.W.2d 827 (1979); *Bialas v. Portage County*, 70 Wis. 2d 910, 912, 236 N.W.2d 18 (1975); *Time Warner, Inc. v. St. Paul Fire and Marine Ins. Co.*, 2001 WI App 174, ¶¶ 19–23, 247 Wis. 2d 367, 633 N.W.2d 640. The agreement here expressly obligates Image to indemnify Arlington, even for liability created by Arlington's own negligence or defects with the machine. Indemnity provisions merely shift the financial burden of potential liability. Arlington did not attempt to substitute Image as the party responsible for producing a safe product. It could not. Rather, it contracted with Image to take the financial burden if the situation should arise where someone claimed Arlington was negligent or designed an unreasonably dangerous product.

¶ 23. Contrary to Image's suggestion, indemnity agreements do not leave Arlington worry-free with respect to its liability. Arlington's indemnity agreement with Image does it no good if Image is unable to pay. If, for example, Image had no insurance coverage and went bankrupt, Arlington would still have been liable to Deminsky. In the "Stipulation for Entry of Judgment," Arlington acknowledged that conflicts in deposition testimony taken created "substantial exposure to liability" for Arlington and that Image had not provided Arlington's defense under the indemnification agreement. Arlington also acknowledged that a verdict for Deminsky would "certainly bankrupt the defendant."

Thus, the settlement agreement offered Arlington a way that the company could survive the litigation and stay in business.

¶ 24. Given the fact that despite indemnity agreements, Arlington could have been financially liable to Deminsky, we disagree with Image's contention that manufacturers and sellers such as Arlington would have no incentive to design and create safe products. Further, as noted in *Dykstra,* disallowing such agreements suggests that it is against public policy for a party to insure against its own negligence. 100 Wis. 2d at 133–34 (citing Robert F. Boden, *The Problem of Indemnity Under the Safe Place Statute,* 40 Marq. L. Rev. 349, 366–67 (1957)). The policies behind strict liability support the allowance of indemnity, particularly under circumstances such as those in this case. Strict liability was intended to make it easier for an injured party to recover. The language used in the Restatement (Third) of Torts: Products Liability § 18 (1998) lends credence to this interpretation. Section 18 states: "Disclaimers and limitations of remedies by product sellers or other distributors, waivers by product purchasers, and other similar contractual exculpations, oral or written, do not bar or reduce otherwise valid products liability claims against sellers or other distributors of new products for harm to persons." Restatement (Third) of Torts: Products Liability § 18 (1998). The major concern, then, as stated, is whether the injured party can recover. The indemnity agreement here does not decrease or destroy Deminsky's chance to recover. In fact, because of Arlington's alleged fragile financial situation, Deminsky's chances of full recovery are better fulfilled if Image and its insurer are respon-

sible under the indemnification agreement. Comment a to § 18 further supports the view that such agreements are allowed:

> a. *Effects of contract defenses on products liability tort claims for harm to persons.* A commercial seller or other distributor of a new product is not permitted to avoid liability for harm to persons through limiting terms in a contract governing the sale of a product. It is presumed that the ordinary product user or consumer lacks sufficient information and bargaining power to execute a fair contractual limitation of rights to recover . . . . *Nothing in this Section is intended to constrain parties within the commercial chain of distribution from contracting inter se for indemnity agreements or save harmless clauses.*

(Emphasis added.)

¶ 25. Again, the expressed concern in this section is fairness to injured parties. The situation here involving a commercial contract between two businesses of equal bargaining power is much different. Image is not an "ordinary consumer" and we cannot and do not presume that such a business lacks sufficient information or bargaining power to "execute a fair contractual limitation of rights to recover." *Id.* As such, the policy concerns toward consumers' public health and safety are not dampened by such indemnity agreements.

■

¶ 26. We next address Image's claim that the indemnity agreement is unconscionable. Image argues that the terms of the agreement are commercially unreasonable, that Image lacked notice of the term, and that the term is inconspicuous. We disagree and therefore conclude that the provision is not unconscionable.

¶ 27. Unconscionability is defined in Wis. Stat. § 402.302.[7] Unconscionability has generally been recognized where there is an absence of meaningful choice on the part of one party, together with contract terms that are unreasonably favorable to the other party. *Discount Fabric House v. Wisconsin Tel. Co.,* 117 Wis. 2d 587, 601, 345 N.W.2d 417 (1984). There are both procedural and substantive factors. *Id.* at 602. Procedural unconscionability requires consideration of the factors bearing on a meeting of the minds, while substantive unconscionability "pertains to the reasonableness of the contract terms themselves." *Id.; Leasefirst v. Hartford Rexall Drugs, Inc.,* 168 Wis. 2d 83, 89–90, 483 N.W.2d 585 (Ct. App. 1992). In *Discount Fabric,* we held that the unconscionability question requires a balancing approach. 117 Wis. 2d at 602. "To tip the scales in favor of unconscionability requires a certain quantum of procedural plus a certain quantum of substantive unconscionability." *Id.* We find that the facts in this case do not support any finding of procedural or substantive unconscionability.

---

[7] Wisconsin Stat. § 402.302 states:

Unconscionable contract or clause. (1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

(2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination.

¶ 28. In *Yauger*, we held that exculpatory contract provisions must unmistakably inform the signer of what rights are being waived and the form must "clearly and unequivocally communicate to the signer the nature and significance of the document being signed." 206 Wis. 2d at 86–87. We held that in order to pass such a test, the exculpatory terms must be conspicuous. *Id.* at 87. Because indemnity contracts in which parties agree to indemnify the indemnitee for the indemnitee's own negligence are, like exculpatory contracts, to be strictly construed, we now hold that the conspicuousness standards in Wis. Stat. 401.201(10) are required for indemnity contracts.[8]

¶ 29. We find that the form and provisions at issue here satisfy the conspicuousness requirement. First, the form was one page, front and back. This was not an onerous form. Directly above the space where Harm signed his name was a one-paragraph warning that there were terms and conditions on the back to which the signer would be held. Right after the paragraph and right above Harm's signature, the word "AGREED" was placed in capital letters. The indemnity provision is contained in a separate numbered paragraph on the back of the form. The paragraph has a heading in capital letters and bold print: "3 - **BUYER'S INDEM-**

---

[8] Wisconsin Stat. § 401.201(10) states:

(10) "Conspicuous": A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: NON-NEGOTIABLE BILL OF LADING) is conspicuous. Language in the body of a form is "conspicuous" if it is in larger or other contrasting type or color. But in a telegram any stated term is "conspicuous". Whether a term or clause is "conspicuous" or not is for decision by the court.

**NITY OF ARLINGTON."** In addition, on the back of the form at the top of the page is another warning in all capital letters stating that the buyer shall be held to all the included terms and conditions.

¶ 30. While the best policy may be to put indemnity language on the front page of a contract, everything does not always fit on the front page. Here, however, for all practical purposes, we have a one-page contract. The reader merely has to flip over the piece of paper to read the terms. Failure to read a contract, particularly in a commercial contract setting, is not an excuse that relieves a person from the obligations of the contract. "Men, in their dealings with each other, cannot close their eyes to the means of knowledge equally accessible to themselves and those with whom they deal, and then ask courts to relieve them from the consequences of their lack of vigilance." *Nauga, Inc. v. Westel Milwaukee Co., Inc.,* 216 Wis. 2d 306, 314–15, 576 N.W.2d 573 (Ct. App. 1998) (quoting this court's decision in *Carney-Rutter Agency v. Central Office Bldgs.,* 263 Wis. 244, 252–253, 57 N.W.2d 348 (1953)). Image has not argued here that Harm was hurried into signing this contract. He had time to carefully review the terms, but he chose not to do so. Additionally, the relevant terms of this contract were conspicuous and the form provided adequate notice to Image of the responsibilities under the contract. There is no argument that the terms of this contract were ambiguous or unclear. Mr. Harm simply chose not to review the contract carefully and such a failure does not warrant relief from his obligations under the contract. Had Harm read the terms, we have no difficulty concluding that he would have ascertained the obligations of the

611

contract terms. Therefore, the form fulfilled the requirement to communicate the nature and significance of the indemnity provision.

¶ 31. Image has previously argued that this is a contract of adhesion and specifically, in this court, has asserted that the terms of the contract are commercially unreasonable. In the context of this case, such arguments fall under the umbrella of substantive unconscionability. A contract of adhesion is generally found under circumstances in which a party has, in effect, no choice but to accept the contract offered, often where the buyer does not have the opportunity to do comparative shopping or the organization offering the contract has little or no competition. *Katze v. Randolph & Scott Mut. Fire Ins. Co.*, 116 Wis. 2d 206, 212–13, 341 N.W.2d 689 (1984). Although Image has argued that it did not have other comparable options, Image admits that it chose Arlington's machine because it was closer and cheaper than others. Image could have bought such a machine from someone else; Greg Harm had a trade book with at least a few other potential sellers. Customers make choices such as these every day. That Image did not like the other options available does not create a contract of adhesion or make the terms of this contract substantively unconscionable. This is not like the *Discount Fabric* case in which the customer had only one viable option for reaching people through an ad in the telephone book. 117 Wis. 2d at 603–04.

¶ 32. We have already noted that the indemnity provision does not violate public policy. There were no elements of an adhesion contract here, because Image had choices. The form and terms provided adequate notice to Image of the indemnity clause and the indem-

nity clause and related terms were conspicuous. The parties to this contract were two commercial entities with prior dealings. As such, Image has failed to show there is any quantum of procedural or substantive unconscionability regarding this contract. We hold that the indemnity clause is valid and enforceable.

## IV

¶ 33. The second issue that arises in this case is the extent to which the settlement agreement reached by Deminsky and Arlington may be binding upon Image. Image argues that because it had no information about a potential settlement, no opportunity to participate in the settlement negotiations, and no opportunity to dispute the agreement reached, it should be allowed a full trial on the issues of liability and damages. Arlington asserts that we should adopt Illinois law and find that Image is bound to the terms of the settlement agreement. Unlike the court of appeals, which found that Image should receive a full trial, we find that Image does carry some responsibility for refusing to defend the action tendered to it by Arlington. However, because under the circumstances of this case, Image did not know that settlement negotiations were in progress and had no opportunity to dispute the validity of the settlement agreement, we remand the action to the circuit court for a limited trial to the court.

¶ 34. Deminsky originally filed suit only against Arlington in May 1998. At his deposition on Febrary 18, 1999, Greg Harm testified that he was aware of the indemnification language in the contract and had contacted Federated Insurance regarding the potential liability. On June 4, 1999, Arlington formally tendered the defense to Image. Deminsky amended his complaint on June 30, 1999, naming Image and Federated as

additional defendants who were directly liable to him under the indemnification agreement. On or about July 15, 1999, Federated sent a letter stating that it would pay Arlington's defense costs in the Deminsky litigation under a reservation of rights, because it believed the indemnity clause may not be enforceable. Federated acknowledged, however, that if the contract was valid under applicable law, then the indemnity language meets the definition of an "insured contract" and the policy covers Arlington's defense costs. The letter to Image ended with the statement, "We will contact you shortly regarding assigning counsel to defend you on the Amended Complaint."

¶ 35. On August 9, 1999, Image and Federated filed separate answers to the amended complaint. Also on August 9, Deminsky and Arlington filed the "Stipulation for Entry of Judgment" with the court. Deminsky agreed not to execute judgment against Arlington; rather, Arlington assigned all rights to indemnity under the contract to Deminsky, who could then attempt to collect from Image. On August 9, 1999, the judge accepted the stipulation without a hearing and entered judgment against Arlington. The amount of the stipulated judgment was $1.475 million dollars, without costs. Deminsky amended his complaint a second time to include the assignment of rights regarding the indemnification agreement. Image had no knowledge of the settlement negotiations and had no opportunity to dispute the terms of the settlement. During subsequent proceedings, Image and Deminsky both moved for summary judgment. The judge granted summary judgment in favor of Deminsky and entered judgment in the full amount of the Deminsky/Arlington settlement, plus interest and costs.

¶ 36. Since the judgment was entered in the Wisconsin court in which Deminsky brought his action, and because the issue deals with Wisconsin's settlement and judgment procedures, we find it appropriate to use Wisconsin law. However, Illinois has handled an issue almost exactly like the one in this case. *See N.E. Finch Co. v. Mahon Co.,* 370 N.E.2d 160 (Ill. 1977). As such, we look to relevant Illinois caselaw for guidance on this issue, while holding true to Wisconsin precedent.

¶ 37. In *Finch,* the Illinois Court of Appeals handled the question of the effect of a settlement agreement between the injured party and the indemnitee upon the indemnitor. *Finch,* 370 N.E.2d at 162–63. There, the defendant in the original case, Finch, requested Mahon to assume the defense on the basis of implied indemnity. *Id.* at 162. Mahon rejected the request and with a trial becoming imminent, Finch settled with the injured party and then attempted to recover its costs from Mahon. *Id.* Much like the circumstances in the present case, the court was left with the issue of "the extent to which the prospective indemnitor is bound by a settlement after the defense of the original action has been tendered to him and refused." *Id.* at 163. In the present case, although Federated asserted in its July 15, 1999, letter that it would defend under a reservation of rights, it took no action.

¶ 38. The court in *Finch* held it of crucial importance that Finch gave Mahon the opportunity to defend and Mahon refused. *Id.* In determining what effect a settlement had on the indemnitor, the court stated: "We believe that once defense of the principal action has been tendered to the prospective indemnitor and refused by him, the indemnitor can not thereafter assert that the indemnitee was a legal volunteer who

gratuitously settled the initial action." *Id.* The court held that this was true even where the indemnitor seeks to establish the non-liability of the indemnitee. *Id.* The court found that so long as the prospective indemnitee was responding to a "reasonable anticipation of personal liability" in settling the original action, the indemnitor is not entitled to question the amount of the settlement "absent fraud or collusion between the parties to the settlement." *Id.* at 162–63.

¶ 39. Public policy supports such a finding because amicable settlements between parties should be supported. *Id.* In *Finch,* the court noted that the policy of encouraging settlements should be furthered by avoiding rules which allow "a defendant no alternative but to litigate the question of his liability to a plaintiff in order to preserve his cause of action over a prospective indemnitor." *Id.* We agree. In *Finch,* the court of appeals noted that a prospective indemnitor has a direct interest in defeating the principal action for which indemnity may be sought. *Id.* at 163.

¶ 40. Wisconsin caselaw supports such findings. In *Illinois Central Railroad Co. v. Blaha,* this court found that when a party, such as a potential indemnitor, is notified of a pending suit in which they are directly interested, that party

> must exercise reasonable diligence in protecting their interests; and if instead of doing so they wilfully shut their eyes to the means of knowledge which they know are at hand to enable them to act efficiently, they cannot subsequently be allowed to turn around and evade the consequences which their own conduct and negligence have superinduced.

*Blaha,* 3 Wis. 2d 638, 644, 89 N.W.2d 197 (1958) (citations omitted). In the insurance context, this court

has found that when coverage is not determined before a liability trial, "the insurer must provide a defense for its insured with regard to liability and damages." *Newhouse v. Citizens Security Mut. Ins.*, 176 Wis. 2d 824, 836, 501 N.W.2d 1 (1993). The court noted that an insurance company that refuses to defend does so " 'at its own peril.' " *Id.* at 835. In that case, the court proposed that the best approach for an insurance company which contests coverage is to defend under a reservation of rights. *Id.* at 837.

¶ 41. Here, Federated suggested that it would defend under a reservation of rights. The problem, however, is that the letter was the last action taken. Federated and Image did nothing further to act. In effect, the tender was rejected and Arlington was left to defend on its own. As in *Blaha,* when a party's conduct leads an indemnitee to conclude that the defendant is ignoring the claim, some responsibility must fall to the potential indemnitor. 3 Wis. 2d at 645.

¶ 42. Under *Finch,* it appears that Illinois law would not allow a new trial under circumstances like those in this case, where a party has rejected the tender of a defense and not asserted fraud or collusion. 370 N.E.2d at 163. However, we believe the circumstances of this case warrant allowing Image an opportunity to be heard on whether the agreement to which it might be bound is unreasonable or infected by fraud or collusion. The timing of the settlement in this case has effectively prevented Image from having such an opportunity.

¶ 43. Wisconsin has at least one case where, in a contractual setting, an indemnitor has rejected the tender of a defense. *See Blaha,* 3 Wis. 2d at 643–49. In *Blaha,* this court held that although the indemnitee

formally demanded the indemnitor take over the defense only five days before trial was set to begin, the indemnitor could not claim insufficient notice because the indemnitor disregarded the potential liability. *Id.* at 643–44. There, the potential indemnitor was aware of the circumstances of the injury, was informed about the contract, and the defendant's board discussed its potential liability. *Id.* at 642–43. The court found that, given these facts, the indemnitor had a responsibility to "exercise reasonable diligence in protecting their interests." *Id.* at 644. Although the formal tender of defense in *Blaha* was made only five days before trial, the indemnitor there was made aware of its direct interest in the case because of the indemnification arrangement well before that formal tender, and simply disregarded the case. *Id.* at 644–45. The same is true here. Although the formal tender of defense was made in June 1999, Image was aware of the circumstances of the accident, was made aware of the indemnification agreement at least by February 1999, and had contacted Federated regarding the potential liability. As such, Image must be held to have some responsibility when it rejected the tender of the defense. As this court has stated: "Considering all the information which defendant had with respect to the [ ] claim long before the trial of the action into which it grew, there was ample opportunity to prepare for a defense. It was defendant's own choice not to avail itself of that opportunity." *Id.* at 646.

¶ 44. However, unlike *Blaha,* communication here regarding the settlement negotiations was completely absent. In *Blaha,* after a trial in which the indemnitee was found liable, the indemnitee informed the indemnitor of the judgment. *Id.* at 648. The indem-

nitee appealed the judgment, and while appeal was pending, it notified the indemnitor that a settlement was being contemplated. *Id.* The indemnitor ignored that notice, and the matter was settled. *Id.* The court held that the indemnitor was bound by the settlement agreement, because the trial court allowed the indemnitor an opportunity to show that there was fraud, an unlitigated defense, or incompetency in the defense, and the indemnitor failed to do so. *Id.* at 647–48. There, too, all the issues were tried to a jury. *Id.* Here, however, settlement was reached before any trial occurred. Image was not informed that any settlement was contemplated, and the settlement was reached the very same day Image and Federated filed their answers to the amended complaint. Although Image is responsible for its failure to provide a defense, we cannot conclude that Image is bound by a settlement reached under circumstances such as those presented in this case.

¶ 45. In *Barrons,* this court noted that in the situation where an indemnitor is given the option of approving settlement or taking over the defense of an action, the indemnitee need only show potential liability and that the settlement reached was reasonable. *Barrons,* 89 Wis. 2d at 455–56.

¶ 46. None of these cases here examined match what we have in this case. We believe that the *Finch* analysis is the most appropriate for the present circumstances. However, in this case, unlike *Finch* and the other cases, Image was not kept informed of the settlement negotiations. More troubling is the timing of the settlement arrangement. Arlington formally tendered the defense to Image in June 1999. Image responded in mid-July and near the beginning of August, on the very day when Image and Federated were due to file answers to the amended complaint, Arlington and Deminsky

settled. Further, the stipulations were forwarded to the trial judge and approved without a hearing and without Image having any knowledge of the events. These facts do not make it equitable to bind Image to the settlement agreement. Both Wisconsin and Illinois have allowed for exceptions to binding agreements. In *Finch,* for example, parties may dispute a settlement by showing that there was no potential liability or that the settlement involved fraud or collusion. *Finch,* 370 N.E.2d at 163.

¶ 47. We conclude that Image is not entitled to a full trial on liability and damages because, just as the indemnitor in *Finch,* Image rejected the tender of the defense. However, because Image had no opportunity to dispute or approve the settlement agreement reached and was unaware negotiations were even proceeding, either due to the timing of negotiations or planning on the part of the settling parties, we hold that Image is entitled to a limited hearing to the court on the reasonableness of the settlement agreement. Under circumstances such as these, the indemnitor is entitled to produce evidence that the settlement was unreasonable, including evidence that the indemnitee faced no potential liability or that the settling parties were involved in fraud or collusion.

¶ 48. As noted earlier, if the circuit court finds that the settlement agreement reached between Arlington and Deminsky is reasonable and free of collusion or fraud, then following cases such as *Finch* and *Blaha,* the judgment in the amount of the settlement originally assessed by the circuit court will stand. On the other hand, if the circuit court finds that the settlement reached is unreasonable—if, for example, the circuit court finds Arlington faced no potential liability—or

involved fraud or collusion, then the parties are back to where they were before a settlement agreement was reached. In this case, the litigation would be headed for a trial on Arlington's liability and damages. Now, however, given the benefit of this opinion, Image will know that the indemnity agreement is valid and binding upon them.

¶ 49. Although the court of appeals extensively analyzes the law of issue preclusion, we conclude, as it ultimately did, that issue preclusion is not applicable in this case because this action was never "actually litigated." *See* Restatement (Second) of Judgments § 27 (1982).[9] Comment d to § 27 of the Restatement (Second) of Judgments, states that an issue is actually litigated when an issue is "properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined." The Comment provides that an issue may be submitted and determined on a motion to dismiss, a motion for summary judgment, a motion for a directed verdict, or their equivalents, or a judgment entered on a verdict. A settlement such as the one in this case does not qualify. As noted in *Michelle T. v. Crozier*, attempts to invoke issue preclusion have generally "been conditioned by requirements designed to protect against unfairly disadvantaging parties." *Michelle T.*, 173 Wis. 2d 681, 687, 495 N.W.2d 327 (1993). Here, invocation of issue preclusion would put

[9] Restatement (Second) of Judgments § 27 (1982):

> When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.

Image at a severe disadvantage under circumstances where Image could not control the outcome. This court declines to promote such an outcome.

¶ 50. In conclusion, we find that the indemnity agreement between Image and Arlington is valid and Deminsky may enforce the agreement. Regarding the second issue, we find that the settlement circumstances here did not allow Image an opportunity to challenge the reasonableness and validity of the settlement agreement. Accordingly, we affirm the holdings of the court of appeals, but modify the judgment to the extent that we remand for a limited trial to the court regarding the reasonableness of the settlement. Because Image rejected the tender of the defense, the burden on remand will fall upon Image to show that the settlement agreement reached was unreasonable, that Arlington faced no potential liability, or that the agreement involved fraud or collusion.

*By the Court.*—The decision of the court of appeals is affirmed, as modified, and the cause remanded.

¶ 51. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE *(concurring)*. I agree with both the legal analysis and remedy of the majority opinion. I write separately because I also agree with Justice Sykes's concern that the circuit court has not been provided with sufficient guidance for conducting the limited hearing on remand.

¶ 52. In the insurance context, many states require that a settlement between an insured and an injured party, after the insurer has wrongfully refused to defend, be reasonable and entered into in good faith

in order to bind the insurer.[1] Guidance can be taken from these cases in setting the parameters for the remand in the case at hand.

¶ 53. The burden of proving reasonableness typically falls on the insured or the injured party, whoever seeks payment from the insurer. In determining whether a settlement was reasonable, the court should consider a variety of factors, including but not limited to the damage sustained, the likelihood that the injured party would have succeeded in establishing the defendant's liability at trial,[2] and whether the amount settled for exceeds the policy limits.[3] Thus the strength of the injured party's case is a fact that is considered in determining reasonableness.

¶ 54. Minnesota courts have adopted an objective standard for measuring the reasonableness of a settlement: whether a reasonably prudent person in the insured's position would have settled for the amount in question after considering "the merits of the [injured party's] claim, the evidence bearing on liability and

---

[1] 14 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 202:9 (3d ed. 1999 & Supp. 2002) (Reasonableness of Settlement and Good Faith in Making It).

[2] *Black v. Goodwin, Loomis & Britton, Inc.*, 681 A.2d 293 (Conn. 1996). Proof of actual liability, of course, is not required. The claimant need only prove potential liability. *Id.* at 302; *see also Barrons v. J.H. Findorff & Sons, Inc.*, 89 Wis. 2d 444, 456, 278 N.W.2d 827 (1979). The point here is that where the claim of liability is tenuous, a settlement for damages at the high end of the spectrum may be unreasonable, whereas in a case in which liability appears clear, that same amount may be reasonable.

[3] Russ & Segalla, *supra* note 1.

damages, and the risks of going to trial."[4] Importantly, however, the reasonableness of the settlement agreement "is not determined by conducting the very trial obviated by the settlement."[5]

¶ 55. The burden of proving fraud or collusion, in contrast, typically falls on the insurer. While some courts maintain that collusion should be proven by clear and convincing evidence, the same burden placed on a plaintiff to prevail in a civil trial on a claim of fraud,[6] others have determined that settlements of this sort deserve heightened scrutiny and thus the burden on the insurer should be lowered.[7]

¶ 56. The reason for a lesser burden on the insurer is especially present where the settlement is a "covenant" agreement in which the settlement includes an assignment of the insured's rights to collect on his policy to the claimant in exchange for a covenant not to execute the judgment against the policyholder.[8] " 'With no personal exposure the insured has no incentive to contest liability or damages' and 'the insured's best

[4] *Brownsdale Coop. Assoc. v. Home Ins. Co.,* 473 N.W.2d 339, 342 (Minn. Ct. App. 1991).

[5] *Alton M. Johnson Co. v. M.A.I. Co.,* 463 N.W.2d 277, 279 (Minn. 1990).

[6] *Lundin v. Shimanski,* 124 Wis. 2d 175, 184, 368 N.W.2d 676 (1985) ("[T]he party alleging fraud has the burden of proving the elements by clear and convincing evidence.").

[7] *Cont'l Cas. v. Hempel,* 4 Fed. Appx. 703, 716 (10th Cir. 2001) (citing Stephen R. Schmidt, *The Bad Faith Setup,* 29 Tort & Ins. L.J. 705 (1994)). While unpublished, this case is cited as persuasive authority pursuant to U.S. Ct. of App. 10th Cir. Rule 36.3.

[8] *Hempel,* 4 Fed. Appx. at 716. For discussion of covenant agreements generally, see Russ & Segalla, *supra* note 1; Stephen R. Schmidt, *The Bad Faith Setup,* 29 Tort & Ins. L.J. 705 (1994).

interests are served by agreeing to damages in any amount as long as the agreement requires the insured will not be personally responsible for those damages.' "[9] Under these circumstances, the traditional collusion inquiry is inappropriate; courts should instead assess the settlement for indications that "the purpose [of the settlement] is to injure the interests of an absent or nonparticipating party."[10]

¶ 57. While I recognize that covenant agreements such as the one at issue in this case are inherently suspicious, I conclude that there is no reason to lessen the burden on Image to prove fraud or collusion. On remand, there are two issues that must be addressed: (1) whether the settlement is reasonable; and (2) whether the settlement is the result of fraud or collusion. Therefore, the burden on Image to prove fraud or collusion will only be necessary if it has already been determined that the settlement is reasonable. Where a settlement is reasonable, it is unlikely to be the subject of either fraud or collusion. Moreover, if it is reasonable, it is certainly unlikely to have been done for the purpose of injuring the indemnitor's interests. Thus, in the face of a reasonable settlement, Image should be held to a high standard of proving fraud or collusion.

¶ 58. For the foregoing reason, I concur.

---

[9] *Hempel,* 4 Fed. Appx. at 716 (quoting *Pruyn v. Agric. Ins. Co.,* 42 Cal. Rptr. 2d 295, 305 (Ct. App. 1995)).

[10] *Id.* (citing Schmidt, *The Bad Faith Setup,* 29 Tort & Ins. L.J. 705, 727–28 (1994)). Some of the indicators include "unreasonableness, misrepresentation, concealment, secretiveness, lack of serious negotiations on damages, attempts to affect the insurance coverage, profit to the insured, and attempts to harm the interest of the insurer."

¶ 59. DIANE S. SYKES, J. *(concurring).* I agree with the majority's analysis of the first issue regarding whether the indemnity agreement is valid and enforceable. I also agree with much of the majority's discussion of the second issue regarding whether Image as indemnitor is bound by the $1.475 million judgment entered by stipulation between Image's indemnitee, Arlington, and the plaintiff, Deminsky, without Image's knowledge or participation. I do not agree, however, with the majority's ultimate conclusion that the judgment may be enforceable against Image/Federated. Accordingly, I cannot subscribe to the limitations the majority has placed on the scope and nature of the remand in this case.

¶ 60. The majority has concluded that the stipulated judgment may be binding upon Image/Federated, provided there is a determination that it is reasonable and was procured without fraud or collusion. Majority op., ¶ 48. The majority remands for "a limited hearing to the court on the reasonableness of the settlement agreement." Majority op., ¶ 47. This hearing can include "evidence that the indemnitee faced no potential liability or that the settling parties were involved in fraud or collusion." Majority op., ¶ 47. The majority does not say whether this "reasonableness" inquiry will include the issue of damages. Also, the majority does not specify the scope of the "reasonableness" inquiry as it relates to the evaluation of the degree or extent of potential liability or recovery under comparative or contributory negligence principles. Finally, the majority does not identify the standards that should govern the circuit court's evaluation of the issues of fraud or collusion.

¶ 61. The majority adopts this limited-inquiry approach to determining the enforceability of the judg-

626

ment by applying several cases it explicitly acknowledges are readily distinguishable from the circumstances of this case. *See* majority op., ¶ 46. The majority initially concludes that this case is unlike *Finch, Blaha, Newhouse,* and *Barrons,* because the timing of the stipulated judgment is suspect and because it was entered into without Image's or Federated's knowledge. *Id.* I agree.

¶ 62. In *N.E. Finch Co. v. R.C. McMahon Co.,* 370 N.E.2d 160, 162 (Ill. 1977), the settlement enforced against the indemnitor occurred after the indemnitor had refused the tender of defense and when trial on the underlying action between the injured party and the indemnitee was imminent. That is not the case here, where the settlement and entry of stipulated judgment occurred a mere three and one-half weeks after the tender was rejected, and on the day that Image/Federated was to responsively plead to Deminsky's amended complaint on the indemnity agreement, long before any trial.

¶ 63. In any event, *Finch* is an Illinois case. The majority has concluded, and I agree, that Wisconsin law applies, because the question presented is the enforceability of a Wisconsin judgment against a person not a party to it, which concerns Wisconsin settlement and judgment rules. Majority op., ¶ 36. Nevertheless, the majority relies most heavily on *Finch* in concluding that the stipulated judgment may be enforceable against Image/Federated. Majority op., ¶¶ 36, 46.

¶ 64. In *Illinois Central Railroad Co. v. Blaha,* 3 Wis. 2d 638, 89 N.W.2d 197 (1958), the indemnitor had full knowledge of the circumstances of the underlying claim, as well as the indemnitee's claims for indemnification long before trial, and received the formal tender of defense five days before the scheduled trial, yet did

nothing to protect its or its indemnitee's interests. As the court of appeals here noted, "the 'settlement' . . . [sought to be enforced] was for a discounted sum pending the appeal of a larger judgment, which had been entered on a jury verdict, and the settlement amount was actually paid by the indemnitee." *Deminsky v. Arlington Plastics Machinery,* 2001 WI App 287, ¶ 41, 249 Wis. 2d 441, 638 N.W.2d 331. Under those circumstances, the court in *Blaha* held that the prior judgment was conclusive on liability and damages, since those issues had been fully tried, and the indemnitor would be responsible for the compromised judgment absent proof that it was unreasonable or obtained by fraud or bad faith. *Blaha,* 3 Wis. 2d at 648–49. Here, by contrast, no trial was held or was looming; the stipulated judgment was entered shortly after the indemnity claim against Image/Federated was alleged, and without any notice, well before any interests of the indemnitee were at risk of being or had been adjudicated against it at trial.

¶ 65. *Newhouse v. Citizens Security Mutual Insurance,* 176 Wis. 2d 824, 501 N.W.2d 1 (1993), was a suit against an insurance company alleging breach of the duty to defend and bad faith denial of coverage. This is not an insurance dispute. It is a claim on an indemnity clause in a commercial transaction. The court of appeals wisely "decline[d] to inject into this case the law that has developed in Wisconsin to govern the duties owed by insurance companies to their insureds." *Deminsky,* 2001 WI App 287, ¶ 43. This court should follow the court of appeals' lead and not import insurance law duties into this context.

¶ 66. Finally, the majority properly notes the myriad distinctions between this case and *Barrons v. J.H. Findorff & Sons, Inc.,* 89 Wis. 2d 444, 278 N.W.2d

827 (1979). There, the indemnitor rejected the tender of defense, but was kept fully advised of the proceedings and settlement negotiations, and in fact was given the opportunity to approve the settlement. *Id.* at 447–48. Here, by contrast, the $1.475 million stipulated judgment (just shy of Federated's $1.5 million policy limits) was entered into within a few short weeks of the rejected tender, secretly, without any notice to Image/Federated.

¶ 67. Despite the distinguishing characteristics of these cases, most of which the majority notes, the majority nevertheless applies their holdings. Majority op., ¶¶ 36, 40, 45. If the cases are distinguishable, they do not apply, and we should not apply them.

¶ 68. The majority also concludes, as did the court of appeals, that issue preclusion does not apply. Majority op., ¶ 49. I agree. This was a confessed judgment and "Arlington's liability and the amount of Deminsky's damages were never 'actually litigated,' which is a prerequisite for precluding issues from being 'relitigated.' " *Deminsky,* 2001 WI App 287, ¶ 39.

¶ 69. If issue preclusion does not apply, then the stipulated judgment cannot operate to preclude Image/Federated from litigating liability and damages; that is, the stipulated judgment cannot be enforced against Image/Federated. Unless, that is, the holdings in the cases cited above are applied. Again, the majority distinguishes these cases but nevertheless applies them. I cannot join this conclusion. I would affirm the court of appeals on all issues, and remand the matter for a trial on liability and damages, not the limited hearing to the court specified by the majority.

¶ 70. I am authorized to state that Justice ANN WALSH BRADLEY joins this concurring opinion.